IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AKEEM MUHAMMAD,

     Plaintiff,

v.                                                    CASE NO. 4:14-cv-379-MW-GRJ

MICHAEL CREWS, et al,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion For Summary
Judgment.  (ECF No. 165).  Plaintiff has filed a Motion for Partial Summary
Judgment (ECF No. 139) and the parties have filed responses in
opposition to the motions for summary judgment. (ECF Nos. 185 & 194.)
Accordingly, this matter is ripe for review.  For the reasons discussed
below, the undersigned recommends that Defendants' motion for summary
judgment, ECF No. 165, should be **GRANTED** and Plaintiff's partial motion
for summary judgment, ECF No. 139, should be **DENIED.**

## I.  BACKGROUND

Plaintiff, a state prisoner incarcerated at Union Correctional
Institution, is a frequent filer classified as a "three-striker" under the Prison

Litigation Reform Act, which bars him from proceeding *in forma pauperis* in federal court.  To avoid the bar on filing, Plaintiff initiated the instant suit in state court pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq., and 42 U.S.C. § 1983. Defendants removed the case to this Court on July 16, 2014 based on jurisdiction under 28 U.S.C. §1331.  (ECF No. 1.)

Plaintiff's claims center around the diet the Florida Department of Corrections ("the Department") provided to him.  As an Orthodox Muslim, Plaintiff alleges that he must follow Orthodox Muslim dietary laws. According to Plaintiff, his religion forbids him from consuming the following: (1) meat from carnivorous animals; (2) meat from non-carnivorous animals that are not slaughtered in accordance with Islamic slaughtering procedures; (3) sea animals other than fish; (4) alcohol; (5) any non-meat food or beverage that contains an ingredient derived from alcohol or meat forbidden by Islam; (6) any non-meat food or beverage prepared in a kitchen or using utensils used to prepare alcohol or meat forbidden by Islam; (7) any non-meat food or beverage that has come into contact with or has been contaminated by alcohol or meat forbidden by Islam; (8) and

any non-meat food or beverage that is served on, in or with a utensil used for alcohol or used for meat forbidden by Islam.  (ECF No. 64 at 4-8.)

Plaintiff says that Jewish kosher dietary laws are similar to Orthodox Muslim dietary laws, except that Islamic slaughter requirements are not fulfilled by kosher meat products.  (ECF No. 64 at 8-10.)  Plaintiff concludes that the current main diet options offered by the Department (including the regular diet, the alternate meatless entree, the vegan diet, and the therapeutic medical diet) all violate Orthodox Muslim dietary laws. Notably, however, Plaintiff says that the Certified Food Option ("CFO") sufficiently complies with his dietary requirements.  (ECF No. 64 at 23-24.)

Plaintiff claims that Defendants' refusal to offer him a diet that does not violate Orthodox Islamic dietary laws is based on intentional discrimination against Orthodox Muslim inmates.  He claims that Defendants' refusal violates the free exercise clause of the First Amendment, RLUIPA, FRFRA (the Florida Religious Freedom Restoration Act), the Equal Protection Clause, and Article I, Sections 2 and 3 of the Florida Constitution.  For relief, Plaintiff requests (1) a declaratory judgment that Defendants' refusal to provide him with a diet that does not violate Orthodox Islamic dietary laws violates RLUIPA, FRFRA, the free

exercise clause of the First Amendment, the equal protection clause of the Fourteenth Amendment, and Article I, Sections 2 and 3 of the Florida Constitution; (2) a permanent injunction requiring Defendants to provide him with a diet that does not violate the Orthodox Islamic dietary laws; (3) nominal damages; (4) punitive damages; (5) costs; and (6) any other relief. (ECF No. 64 at 24-27.)

Defendants filed a Motion for Judgment on the Pleadings, requesting that all the official capacity claims against Defendants other than the Secretary of the Department be dismissed.  (ECF No. 113.)  The Court granted Defendants' motion dismissing all official capacity claims against Defendants other than Secretary Julie Jones.  (ECF No. 144.)  The remaining claims are the official capacity claims against Defendant Jones under RLUIPA and FRFRA, and individual capacity claims for violations of the free exercise clause of the First Amendment, the equal protection clause of the Fourteenth Amendment, and Article I, Sections 2 and 3 of the Florida Constitution against the remaining Defendants.

## II.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), the entry of summary judgment is appropriate only when the Court is satisfied that

"there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.   *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785-86 (11th Cir. 2005).

## III.  DEFENDANTS' EVIDENCE

The evidence in this case submitted by both parties is voluminous, and as such, will be summarized to highlight the most pertinent parts.

Defendants have each submitted their own declarations in support of their motion for summary judgment.  All of the Defendants deny Plaintiff's allegations of intentional discrimination against Plaintiff or other Muslim inmates on the basis of religion.  Each Defendant, with the exception of the Secretary, denies they have authority over the content of or types of religious diets offered by the Department.  In addition, each of the declarants provides the following information:

- ● ***Michael Crews, former Secretary of the Department***: Crews represents that he did have the ultimate decision-making authority over what diets were offered to inmates, and in making decisions regarding the diets offered, he considered the effect on the agency's budget, security of the institutions, safety, and the effect on the operation and staff.  He avers that individualized diets were unsustainable for the Department and that none of his decisions regarding religious diets were made out of discrimination against either Muslim inmates or Plaintiff. (ECF No. 165-1.)

- ● ***Timothy Cannon, the Deputy Secretary of the Department***: Cannon explains that his duties involve implementing policy, rather than creating it.  He avers that he does not have "any real input" on the issue of religious diets.  (ECF No. 165-2.)

- ● ***Michael Dew, former Chief of Staff of the Florida Department of Corrections***: He was responsible for

implementing and executing policy decisions, but not making policy decisions, such as the content of religious diets.  (ECF No. 165-3.)

- ● **Kim Southerland, warden of Marion Correctional Institution and former Deputy Assistant Secretary of Re-Entry**: As the Deputy Assistant Secretary of Re-Entry, she did not have authority over diets offered by the Department.  She explains that Chaplaincy Services is part of Re-Entry; however, she did not have any expertise in that area and would defer to the chaplaincy  and legal staff on religious matters. (ECF No. 165-4.)

- ● **Alex Taylor, Chaplaincy Services Administrator for the Department**: His duties include establishing guidelines for the observance of religious practices in the correctional setting.  He explains that the Department provides services and other opportunities for each scheduled faith group to make religious observations, but limitations are necessary due to the nature of the institution.  He clarifies that chaplains can provide input but cannot override determinations pertaining to inmate movement, classification, or security. Taylor states that the Department offers a Religious Diet Program, including a Jewish Dietary Accommodation Program ("JDAP")  that is kosher.  JDAP was terminated in 2007.  Taylor avers that the Department's position is that vegan and no-meat meals, including the elimination of pork from all menus, accommodates the majority of religious dietary needs. Taylor describes the Certified Food Option ("CFO") introduced in 2013, which is comprised of kosher food items and pareve, or neutral items.  He explains that the reason the CFO is based on a kosher diet is because a kosher diet satisfies many different religious dietary needs. Taylor claims that the CFO started as a pilot program in July 2013 and was more popular than expected at each institution where it was introduced.  As a result, in March 2014 the Department replaced the prepackaged meals with an all-cold menu that was cheaper and easier to prepare.  The all-cold menu was implemented in April 2015. (ECF No. 165-5.)

- ***James Upchurch, Assistant Secretary of Institutions***:  He explains that his role was to provide input regarding security concerns and the effect on the overall institutional population and any input he had concerning religious diets was based on upholding Department rules and policies, maintaining security, and providing for the safety of inmates and staff. (ECF No. 165-6.)

- ***Mark Tallent, Director of Budget and Financial Management***: Tallent states that his only input on dietary matters is related to the budget and whether the Department has enough funding for any particular program.  He provides information concerning the Department's budget for the current year and cost analyses for the CFO meals at various levels of participation.  (ECF No. 165-7.)

- ***Jodi Bailey, former Division Director of Procurement and Contract Management***:   She states that the division that she previously worked with is responsible for oversight and coordination of executive level contracts, including the bidding process.  Her involvement was limited to managing the food service contract and supervising nutritionists employed by the Department.  (ECF No. 165-8.)

- ***Jon Creamer, former Bureau Chief of Contract Management and Monitoring***: He claims that his position was mainly responsible for "high-level administration regarding systemic contract issues, including procurement and re-bidding of contracts."  He states that his role was to determine whether any contract issues existed with the food service contract and managing and monitoring those contracts.  (ECF No. 165-9.)

- ***Kathleen Fuhrman, former Public Health Nutrition Program Manager***:  She states that she analyzed proposed menus to ensure nutritional adequacy, including whether the diet satisfied the Dietary Reference Intakes ("DRIs") of the Food and

Nutrition Board of the National Academy of Sciences.  She
suggested changes that were needed to satisfy dietary
requirements.  She represents that she is familiar with Plaintiff
because she has been involved in other lawsuits he has filed.
(ECF No. 165-10.)

- *Diane Andrews, the Warden of Union Correctional
  Institution*:  She states that as warden, she is responsible for
  the operation of Union CI, including maintaining safety and
  security.  She ensures that all rules, policies, procedures, and
  directives of the Department are carried out.   She asserts that
  she is familiar with Plaintiff because he is currently incarcerated
  at Union CI.  (ECF No. 165-11.)

- *Jeffrey Campbell, OPS Chaplain at Union Correctional
  Institution*: He states as an institutional chaplain, he does not
  have any authority over the types of religious diets offered or
  the content of the diet.  He explains that he was hired at Union
  CI because of the overwhelming response to the CFO in 2013.
  His primary function is handling the needs of the Religious
  Dietary Program. Campbell states that in November of 2013,
  Plaintiff's CFO application was denied because he requested a
  diet option, a CFO without kosher meat products, that was not
  offered by the Department.  If an inmate is denied approval for
  a CFO, he may not re-apply for six months.  Since then, the
  Department changed the CFO menu to an all-cold menu that is
  mostly vegetarian, with the exception of sardines.  Plaintiff
  applied and was approved for the new CFO in May of 2014.
  Campbell states that Plaintiff still receives the CFO diet today.
  Campbell states that while he tries to accommodate all
  religious requests made by inmates within reason, he does not
  have the authority to act outside of the scope of the
  Department's rules or policies, including the rule that an inmate
  must wait six months to re-apply for the CFO after denial.  .
  (ECF No. 165-12.)

- *Joe Henkle, Senior Chaplain at Union Correctional
  Institution*:  He states that his responsibilities include

"conducting religious services and program, counseling inmates, and monitoring and supervising volunteers." He asserts that Campbell approved Plaintiff for the CFO diet in May 2014 and that Plaintiff continues to receive this diet. (ECF No. 165-13.)

- ***Carl Wesley Kirkland, Jr., Bureau Chief of Security Operations for the Department***:  His duties include coordinating the security operations for statewide coordination, reviewing and developing security procedures within the Department, developing post orders, staffing plans, post charts, and master rosters, among other tasks.  Although not a Defendant, Kirkland provides information on the security concerns surrounding Plaintiff's request for an individualized religious diet.  He states that there are several security concerns: (1) other inmates perceiving an individualized religious diet as preferential treatment, which would result in increased safety and security risks; (2) inmates attempting to obtain a specialized meal for non-religious reasons, and "opening the door" for other inmates to request individualized religious diets; (3) a specialized meal creates additional security issues, such as the possibility of attacks and diverting security staff from their regular duties to monitor scanners; and (4) religious diets often use prepackaged food items, making theft and bartering a possibility.  (ECF No. 165-15.)

- ***Shane Phillips, Operations Manager in the Bureau of Contract Management and Monitoring***: He claims that the cost of providing Plaintiff with a daily halal diet would be $13.88 per day, and other inmates would request the same if provided to Plaintiff.  He represents that the Department would incur additional costs in the form of specialty equipment, such as microwaves and heated cabinets.  He states that the individual religious diets would increase the workload for the Department nutritionists in preparing menus and substitutions.  Mr. Phillips states that operating an individualized diet program would be unmanageable.  (ECF No. 170-1.)

The Certified Food Option, or "CFO," is a religious diet containing kosher certified items, pareve items (no meat or dairy), and fruits and vegetables.  (ECF No. 165-5.)  The CFO program is available to inmates of multiple different faiths.  The decision to use a kosher diet was because a kosher diet complies with the needs of many religious faiths.  The pilot CFO program began in July 2013, as a "tv dinner" type entrée that was heated in microwaves.  The meals cost about $7.35 per inmate compared to the regular meal cost of $1.83 per inmate.  The CFO program required the purchase of microwaves, heated cabinets, and egg cookers at the expense of about $30,000-$45,000 per institution.  (ECF No. 170.)

Because the popularity of the program was greater than expected, the Department began looking for ways to lower the cost of the CFO "hot meal."  The Department changed the CFO to a cold menu in March 2014, which cost $3.667 per inmate per day compared to the regular menu cost of $1.817 per inmate per day.  (ECF No. 170.)

The CFO program requires one additional food service staff person for every fifty inmates participating in the CFO.  The additional staff supervises the inmates preparing the CFO meals in an area separate from the preparation of the regular meal option.  From the beginning of the CFO

program to the end of fiscal year 2014-2015, the additional staff members

cost the Department $805,798.14. The additional chaplains hired to handle

applications for the CFO program cost $951,772.50 for the same period.

The card swipe scanning system to oversee provision of the CFO cost, in

total, $178,431, with a recurring cost of $42,603 per year.  (ECF No. 165-7)

The Department's budget appropriation for fiscal year 2015-2016 is

roughly $2.35 billion total, with $2.28 billion approved for operating budget

funds.   The food products budget is about $65 million.  The food service

budget is about $5.2 million.  The Department obtained an increase in the

overall food budget of about $11 million due to a new prime vendor

contract and the costs of the CFO program.  (ECF No. 165-7.)

The Department will have a deficit carried into this fiscal year from

the previous year.  The CFO program is projected, at current participation

rates, to cost between about $10 million and $14 million for the upcoming

fiscal year.  (ECF No. 165-7.)

If the CFO were to change so that it no longer met Plaintiff's dietary

requirements, the Department would incur additional costs related to the

individualized provision of a religious diet for Plaintiff.  Halal prepackaged

diets cost $13.88 per day, and providing the appliances necessary for

preparation would cost about $6,000 just for Plaintiff.  (ECF No. 170.)
Notably, Plaintiff's suggested meals have been determined to be
nutritionally inadequate by the Department.  *Id*.   Additionally, provision of
an individualized religious diet to Plaintiff would likely result in numerous
inmate requests for an individualized diet, creating exponential costs for
the Department.  *Id*.

Several security concerns associated with an individualized religious
diet exist.  Inmates may believe that the individual religious diet is a result
of preferential treatment, which increases safety and security risks and
decreases inmate morale.  An individualized diet would likely lead to
potential discord and violence.   (ECF No. 165-15.) Furthermore, allowing
individualized diets among inmates would require additional staff to
supervise meals and verify which meals are provided to each inmate,
which would divert security staff from other security functions.  An
additional concern is the availability of prepackaged items in individualized
diets, which present an opportunity for theft.  *Id.*

Defendants submitted portions of the deposition of Plaintiff, taken on
March 31, 2015.  (ECF No. 165-14.)  In the excerpts of the deposition,
Plaintiff states that he is trying to find out who is responsible for approving

individual religious dietary accommodations.  Plaintiff states in the deposition that he presumes most of the Defendants in this case know about Orthodox Islamic dietary laws and his individualized dietary requests through his lawsuits, affidavits, and grievances.  *Id*.

## IV.  PLAINTIFF'S EVIDENCE

As the evidence provided by Plaintiff is also voluminous, it will be summarized by highlighting the most important aspects.

In his response, Plaintiff represents that he does not oppose Defendants' motion for summary judgment as to Defendants Kim Southerland, Timothy Cannon, Michael Dew, or Jodi Bailey.  (ECF No. 185 at 12.)  In his response Plaintiff  outlines the Orthodox Islamic dietary laws that he follows and the Department's policies on religious dietary accommodations.  Plaintiff says that Defendants' vegan and alternate entree and medical diets accommodate the religious dietary laws of most religious groups except for kosher and Orthodox Islamic dietary laws.  He states that Defendants "should provide Plaintiff with a no-meat, cold diet consisting of canned beans and cold non-meat foods and beverage" and a no-meat Kosher diet, which would satisfy his religious dietary requirements.  He claims that the diets currently offered either contain

meat that does not conform to his dietary requirements or have been prepared with utensils and materials contaminated with meat.  (ECF No. 185.)

Plaintiff offers several suggestions in his response for the Department to cut the costs associated with providing religious diets. Plaintiff says that Defendants could significantly reduce the cost of the current CFO diet by making certain food item substitutions.  (ECF No. 185 at 51-53.)  He additionally argues that Defendants could reduce the cost of the CFO program by excluding inmates without a sincere religious need for the CFO from participating.  (ECF No. 185 at 53-58)  He makes a similar argument for eliminating "attractive" items from the CFO that could be used for bartering  (ECF No. 185 at 60-61) and argues that inmate interest in the CFO will decrease over time.  (ECF No. 185 at 64-65.)  Plaintiff makes other suggestions for the Department to cut costs with respect to provision of religious meals, including not hiring additional chaplains, not using a card-swipe scanning system for the CFO program, and not accommodating Jewish Passover for all inmates receiving the CFO.

Plaintiff submits an affidavit discussing his dietary needs, including his suggestions for an individualized meal to be prepared for him by the

Department. (ECF No. 185-1 at 6-20.)  Plaintiff also has filed answers to the interrogatories provided by all Defendants.  (ECF No. 185-1 at 21-54, 73-76, 88-100, 139-151, 161-177, 187-199, 236-238; ECF No. 185-2 at 6-21, 38-41, 60)  Plaintiff also submits expert reports regarding the feasibility of providing kosher diets throughout the Department in the CFO program. (ECF No. 55-72, 253-265; ECF No. 185-2 at 42-58, 82-99.)

Plaintiff previously settled with the Department in *Muhammad v. Davis*, 3:10-cv-705-RBD-JRK (N.D. Fla. June 2013) for provision of a specialized meal during Ramadan, specifically his regularly assigned hot dinner tray and an alternate entrée "bag lunch" meal for him to eat in the morning prior to astronomical twilight.  (ECF No. 185-1 at 78-80.)

## V. DISCUSSION

### A. RLUIPA dietary claim

In his Complaint, Plaintiff details the Orthodox Islamic dietary laws that he says his religion requires him to comply with and requests that the Court enter a permanent injunction "requiring Defendants, their successors, and their agents to provide Plaintiff a diet, any diet, that does not violate the Orthodox Islamic dietary laws outlined above . . . ."[1]

---

[1]Plaintiff includes the conditions that this individual religious diet should only be
(continued...)

Since May of 2014, Plaintiff has been approved for and has been receiving the Certified Food Option ("CFO"), a diet designed to accommodate religious dietary needs through prepackaged meals.   (ECF No. 165-12.)  Plaintiff states in his Complaint that the CFO comports with his religious dietary requirements.  (ECF No. 64 at 23-24.)  Defendants represent that as of the date of their summary judgment motion, Plaintiff continues to receive the CFO option.  (ECF No. 165-12.)  Because Plaintiff is receiving a food option he admits complies with his religious dietary requirements and the record without dispute demonstrates that Plaintiff is receiving the CFO option, under normal circumstances that would resolve the case.  Apparently, it does not because Plaintiff is not requesting the Court to enter a permanent injunction requiring the Department to provide the Plaintiff with the CFO option but rather he is requesting the Court  to enter a permanent injunction requiring the Department to provide him with an individualized religious diet that meets the specific Orthodox Islamic dietary laws that Plaintiff believes he is required to follow.

---

[1](...continued)
provided if (1) he has a sincere religious belief that requires him to consume this diet; (2) he has not abused such a diet within the preceding two years; and (3) the provision of this diet does not cost more [to] Defendants[] th[a]n existing medical diets, vegan diet, and/or regular diet.  (ECF No. 64 at 26-27.)

To establish a *prima facie* case under RLUIPA, "a plaintiff must demonstrate 1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened."  *Smith v. Allen,* 502 F.3d 1255, 1276 (11th Cir. 2007); 42 U.S.C. § 2000cc-1(a).  If a plaintiff establishes a *prima facie* case, the burden shifts to the government to "demonstrate that the challenged government action 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling governmental interest.'"  *Smith*, 502 F.3d at 1276 (quoting 42 U.S.C. § § 2000cc-1(a), 2000cc-2(b)).  But "[c]ontext matters in the application of that standard," and it should be applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (internal citations omitted).

  Defendants do not dispute that Plaintiff has a sincerely held belief in Orthodox Islam that requires that he follow the specified dietary laws. Defendants similarly do not contest that any failure to provide Plaintiff with a diet that follows Orthodox Islamic laws substantially burdens his religious

practice.  Consequently, under RLUIPA the burden shifts to Defendants to demonstrate a compelling state interest and that the decision not to provide Plaintiff an individualized religious diet is the least restrictive means of serving that compelling interest.

Plaintiff— a frequent filer and also a three-striker— has litigated an almost identical RLUIPA claim before this Court and the Eleventh Circuit. In *Muhammad v. Crosby*, Plaintiff requested his own individualized diet to meet his religious dietary needs.  *Muhammad v. Crosby*, Case No. 4:05-cv-193-WS-WCS, 2009 WL 2913412 (N.D. Fla. Sept. 3, 2009)(granting summary judgment in favor of defendants on plaintiff's RLUIPA claim requesting an individualized halal diet). There, Plaintiff claimed his religion required that he "consume only uncooked vegetarian products" and argued that the regular, vegan, and alternate entrée diets offered by the Department did not comply because the food was contaminated by improper meat or alcohol products or byproducts.  *Id.*  In the previous case Plaintiff also asked that his meals not be prepared near meals containing meat or alcohol because of the contamination risk. This Court found that while Plaintiff had shown a substantial burden on the exercise of his religious beliefs, Defendant showed a compelling interest in cost

containment, avoiding increased security risks, and avoiding impractical administrative issues. *Id.* The Court, therefore, granted Defendants' motion for summary judgment on Plaintiff's RLUIPA claim.

Plaintiff appealed this Court's entry of summary judgment to the Eleventh Circuit. *Muhammad v. Sapp*, 388 F. App'x 892 (11th Cir. 2010). The Eleventh Circuit affirmed and upheld this Court's entry of summary judgment in favor of the Department, finding that the expense of complying with Plaintiff's dietary requests justified the Department's refusal and that the Department's provision of alternative entrée meals and vegan meals was the least restrictive means of furthering a compelling governmental interest in cost containment. *Id.* That decision controls the outcome of this case and confirms that cost may be a compelling interest that warrants a refusal to provide a particular religious diet.

Other cases also confirm this principle. For example, in *Linehan v. Crosby*, 2008 WL 3889604 (N.D. Fla. Aug. 20, 2008) this Court granted summary judgment in favor of defendants on a RLUIPA claim where the plaintiff, a Seventh-Day Adventist, sought a kosher diet.   The Court there found that "the excessive cost, as well as administrative and logistic difficulties, of implementing a kosher meal plan in the Florida prison system

are compelling state interests, and the current vegan and vegetarian diets are the least restrictive means of addressing this compelling interest." *Linehan* at *2.  The Court in *Linehan* further observed that, according to the affidavits submitted by Department officials, the special treatment would cause unrest among other prisoners, resulting in significant security risks, and that the cost would be far too great.  *Id.* at *1-*2.  The Eleventh Circuit affirmed the district court's grant of summary judgment in favor of Defendants on the plaintiff's RLUIPA claim, stating that "the current policy of providing vegan and vegetarian meals instead of kosher meals was the least restrictive means of furthering the compelling governmental interests of keeping costs down and preventing security risks."  *Linehan v. Crosby*, 346 F. App'x 471 (11th Cir. 2009).

Similarly, in *Baranowski v. Hart*,  486 F.3d 112 (5th Cir. 2007) the Fifth Circuit held that while a Jewish kosher diet was a valid exercise of the prisoner's religious beliefs and a failure to provide it substantially burdened his free exercise of that belief, RLUIPA was not violated because the "dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling government interest."  *Baranowski* at 124-25. The court there looked to affidavits provided by prison officials, who stated

that providing kosher meals would be too costly, would jeopardize the nutritional meals of inmates receiving standard meals, would breed resentment among other inmates, and that other religious groups would demand similar diets.  The *Baranowski* court affirmed the trial court's grant of summary judgment to Defendants on his RLUIPA claim.

To be sure, this does not mean that under RLUIPA an institution will have met its burden under the statute and be permitted to deny the religious request simply because it might cost more to provide the alternative diet. Indeed, the text of RLUIPA  recognizes that the government may *have* to incur costs to avoid imposing a substantial burden on religious exercise.  42 U.S.C. § 2000cc-3(c); *U.S. v. Secretary, Florida Dep't of Corrections*, Case No. 12-22958-CIV, 2015 WL 1977795 (S.D. Fla. 2015).  But the magnitude of the cost to be incurred by the government under RLUIPA is not limitless, either.

In *Cutter v. Wilkinson*, the Supreme Court discussed the legislative history of RLUIPA and the importance of considering other necessities of prison administration: discipline, order, safety, and security.  *Cutter*, 544 U.S. at 722-23.  The Fifth Circuit has likewise discussed the necessity of balancing religious freedom with the "institutional need to maintain good

order, security, [] discipline, [and] costs."  *Baranowski*, 486 F.3d at 125.

Therefore, while simply stating that a religious accommodation is

expensive may not be enough for an institution to demonstrate a

compelling RLUIPA interest, a cost that is so prohibitive that it interferes

with the other functions of the prison may be sufficient to establish a

compelling interest.

 The claim Plaintiff raises in this case is almost identical to the claim

addressed in *Muhammad*.  Indeed, Defendants advance many of the same

cost, administrative, and security arguments that the Department argued

before the Eleventh Circuit in *Muhammad*.  In particular in this case

Defendants detail the costs associated with just providing the CFO

program, a religious kosher diet designed to satisfy the religious dietary

requirements of many different religions, including Muslims, Nation of

Islam, Messianic Jewish, Hebrew Israelite, Seventh Day Adventist, Muslim

Sunni and Muslim Shiite.  (ECF No. 165-5.)

 With regard to costs Defendants have submitted evidence

demonstrating that even after the Department switched to the cold menu

CFO (which is cheaper than the hot menu) the CFO meal is significantly

more expensive than the regular inmate meal. The CFO diet costs $3.667

per inmate, per day, as compared to$1.817 for the regular menu.  (ECF No. 170.)  Further, the record demonstrates that participation in the CFO program has far exceeded the expectations of Department officials since its inception. For example, in July of 2015, participation in the RDP/CFO program was 11.08% of inmates statewide.  (ECF No. 165-5.)

Defendants' evidence not only demonstrates that the CFO is more expensive in terms of the actual cost of the food, but that the CFO requires additional expenses.  The CFO program requires the Department to hire extra food service staff and chaplains to ensure that the program functions properly. The Department needs one food service staff member for every fifty inmate participants in the program.  (ECF No. 170.)   Defendants aver that these additional staff members have cost the Department $805,798.14 since the program's beginning.  (ECF No. 165-7)   The additional chaplains, who are necessary to oversee the increasing applications for the CFO program, have cost the Department $951,772.50 since the program's beginning. *Id.*  These costs only represent the Department's costs with respect to provision of the cold diet CFO, which the Department provides to all inmates who are approved for the program.

Plaintiff does not challenge these costs nor that the CFO he is receiving complies with his religious dietary requirements but instead argues that, in the event that the Department changes the CFO in a manner that does not comply with Plaintiff's dietary restrictions the Department should be required to provide him with an individualized religious diet. The Department contends that the costs associated with providing individualized religious diets would be much greater than the costs associated with the CFO option, where each inmate receives an identical meal.

Plaintiff alleges that the diet he receives should contain no meat products and should be prepared with unused plastic gloves and on unused plastic wrap, in an area separate from any area where meat is prepared, and in an area that is not contaminated by meat residue on utensils or other items.  Defendants represent that should the CFO option become unsatisfactory for Plaintiff, their options for providing him with a religious diet are limited.

The undisputed evidence of record demonstrates that Providing Plaintiff with a prepackaged halal diet[2] would cost the Department $13.88

---

[2] In his affidavit, Plaintiff states that even a certified "halal" diet would not meet his individual dietary needs, as the certification is provided by non-Orthodox Muslims and

(continued...)

per day.  (ECF No. 170.)  In addition to the cost of the meal, the Department would have to purchase microwaves and heated cabinets to prepare the halal diet, which would total about $6,000 for Plaintiff individually.  *Id.*  In response, Plaintiff argues that he can subsist on a meal of cold canned beans, along with other items that the Department already has in stock for the regular provided diets. The problem with this suggestion, as Defendants point out, is that this menu is not deemed nutritionally adequate by the Department's nutritionists.  *Id.*

Defendants represent that the costs for the Department will exponentially increase if multiple inmates request an individualized religious diet.  Shane Phillips, the Operations Manager in the Bureau of Contract Management and Monitoring, says in his declaration that if Plaintiff is served an individualized diet, other inmates will request the same diet, leading to a significant increase in costs.  *Id.*  Mr. Phillips avers that these additional costs will "interfere with the Department's ability to adequately fund institutional operations and maintain safety and security in [the] facilities."  *Id.*  The increased costs will not only include the cost of the

---

[2](...continued)
thus violate Orthodox Islamic dietary laws.  (ECF No. 185-1 at 7.)

food itself, but the additional kitchen appliances necessary to prepare the diets and the additional staff needed to handle these requests.  *Id.*

Furthermore the Department has demonstrated that the administrative burden that individualized religious diets would create would be absolutely unworkable for the Department.  In addition to the significantly increased costs for individualized religious diets, the workload for Department staff would be exponentially increased.  Each new menu created by an inmate would require the statewide nutritionist and staff to maintain a substitution list, to approve substitute foods, and to analyze the menu for nutritional adequacy.  *Id.*  Additional menus require additional preparation time, space, inmate workings, supervising staff, and additional cooking equipment.  *Id.*  Any time an inmate with an individualized religious diet is transferred, the extra equipment and staff would need to be provided at the new institution.  *Id.*  Mr. Phillips concludes that "the Department's food service department simply cannot function under this type of system."

Finally, the security issues already present within the Department would increase significantly in the face of individualized religious dietary plans.  Carl Wesley Kirkland, Jr., the Bureau Chief of Security Operations of the Department, states in his declaration that this system would create serious security concerns.  (ECF No. 165-15.)  He avers that a special diet

would be seen by other inmates as one inmate receiving preferential treatment, which is contrary to the aim of the Department to create a consistent and restrictive environment. *Id.* Mr. Kirkland states that this sense of "preferential treatment" would create an increased risk of confrontation and violence. *Id.* Furthermore, Mr. Kirkland avers that providing customized meal plans to inmates is "simply unmanageable." *Id.* He states that the individualized meal plans would require that additional security staff be diverted from primary security functions to monitoring inmate compliance with "religion related criteria" with respect to food preparation. *Id.* Finally, Mr. Kirkland lists additional security problems that the individualized diet plan would create for security, including theft, bartering, food service security issues, and diversion of security staff. He says that the provision of a specialized religious diet to one inmate and fulfilling the "countless requests for similar treatment that are sure to follow" creates "an untenable situation." *Id.*

The Court therefore, concludes that Defendants have demonstrated that the costs, administrative burden, and security risks the Department would incur if Plaintiff was given an individualized diet, instead of the CFO, is more than sufficient to establish a compelling governmental interest for

denying Plaintiff the requested relief.  Not only would the costs and other burdens be substantial, they would be—as characterized by one of the declarants— "simply untenable."

While RLUIPA contemplates some burden on an institution to comply with religious needs, RLUIPA does not contemplate that a prison must bear increased costs at the expense of  discipline, order, and safety so that it may cater to every specialized religious need.  Accordingly, the Court concludes that Defendants have met their burden of  showing that denial of an individualized religious diet is the least restrictive means of furthering the Department's interesting in controlling costs, administrative burdens, and security risks.

The Court is well aware of the recent litigation in *U.S. v. Secretary*, Case No. 12-22958-CIV-SEITZ/TURNOFF, 2015 WL 4768247 (S.D. Fla. Aug. 12, 2015).  Plaintiff says this case supports his position, while Defendants say the case is not controlling because this case is different.

In *Secretary*, the court entered a permanent injunction requiring the Department to provide kosher meals to all Jewish inmates whose religious beliefs require kosher meals through the Religious Diet Program.   The court there found that the Department's policies, which included a blanket

denial of a kosher diet, a 90 day rule, religious orthodoxy testing, a zero tolerance removal provision, and the ten percent rule, did not constitute the least restrictive method of furthering a compelling interest.

Plaintiff relies upon some of the discovery from *Secretary* as support for his position in this case, attaching to his response depositions taken in *Secretary* from Jon Creamer, Shane Phillips, Alex Taylor, Stevin Rossiter, Mark Tallent, James Upchurch and expert reports submitted in *Secretary* by John L. Clark, Dennis Watkins, James Upchurch, and Shane Phillips. The admissibility of these exhibits in this case, however, is limited by both the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Federal Rule of Civil Procedure 32(a)(8) limits the use of depositions that were taken in an earlier action to a later action "involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." The Federal Rules of Evidence also limit the use of deposition testimony from another proceeding only if "the party against whom the testimony is now offered ... or a predecessor in interest ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1).  Together, the rules provide that

deposition testimony taken in a different case involving different parties is inadmissible and cannot be considered on a summary judgment motion. *See Northwestern Nat'l Ins. Co.,* 15 F.3d at 662; *see also Hughes v. City of Chicago,* 673 F. Supp.2d 641, 651 (N.D. Ill. 2009) ("At the summary judgment stage, a party may rely on deposition testimony from a separate action where the case involved the same parties and subject matter") (internal citations omitted); 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 2150 (3d ed. 1998). Although Department officials are Defendants in both cases, the plaintiff and subject matter are different in both actions and, therefore, depositions taken in *Secretary* are inadmissible.

Additionally, expert reports prepared for another proceeding are not admissible on summary judgment.  The experts were not subject to cross examination in this case, nor were they disclosed.  *See Hutchinson v. Groskin*, 927 F.2d 722, 724 (2d Cir. 1991)(district court erred in presenting expert conclusions in letters when experts were not subject to cross examination); *Glowczenski v. Taser Intern., Inc.*, 928 F. Supp. 2d 564 (E.D.N.Y. 2013)(expert reports from other litigation were not admissible on summary judgment because experts were not disclosed).   Accordingly, the depositions and experts reports from *Secretary* relied upon by Plaintiff in

support of his position are not admissible and should not be relied upon in this case.

Independent of whether depositions and expert reports from *Secretary* are admissible, the depositions and expert reports are not relevant to the primary issue in this case. While the court in *Secretary* addressed the balancing test of RLUIPA, the main issue there is wholly different from this case. *Secretary* concerned the provision of kosher diets to all Jewish inmates in the Department with a sincere religious belief, while this case concerns provision of an individualized religious diet to an Orthodox Muslim. In *Secretary*, the court held that the Department did not have a compelling interest in not providing kosher meals to inmates with a sincere belief because the Department already was voluntarily implementing a policy in which the Department was providing kosher meals to inmates that required them. Here, the issue is whether the Department must provide an individualized diet to one inmate and not a diet provided to inmates who share similar or the same religious beliefs. Thus, while the Court in *Secretary* considered the same balancing test under RLUIPA, the issue here is entirely distinct and the decision in *Secretary*, therefore, is not controlling on the result in this case.

For all of these reasons, the Court concludes that Plaintiff has failed to demonstrate his entitlement to the requested relief under RLUIPA and, therefore, Defendants are entitled to summary judgment in their favor with respect to Plaintiff's claim under RLUIPA.

Plaintiff also claims that the refusal to provide him with an individualized religious diet violates the Florida Religious Freedom Restoration Act ("FRFRA").   Federal and state courts apply the same substantial burden and compelling state interest analysis under FRFRA as under RLUIPA.  *See Westgate Tabernacle, Inc. v. Palm Beach County*, 14 So.3d 1027 (Fla. Dist. Ct. App. 2009); *Christian Romany Church Ministries, Inc. v. Broward County*, 980 So.2d 1164 (Fla. Dist. Ct. App. 2008); *Konikov v. Orange County*, 302 F. Supp. 2d 1328, 1346 (M.D. Fla. 2004), *rev'd in part on other grounds*, 410 F.3d 1317 (11th Cir. 2005).  It therefore follows that because Plaintiff fails to show entitlement to relief under RLUIPA, he is not entitled to relief under  FRFRA. Summary judgment should be entered in favor of Defendants as to Plaintiff's FRFRA claim.

## B.  First Amendment claim

Plaintiff maintains that from May 1, 2010 to May of 2014, Defendants Crews, Cannon, Dew, Upchurch, Taylor, Southerland, Tallent, Bailey,

Creamer, Andrews, Fuhrman, Campbell and Henkle failed either to provide or approve a diet for him that does not violate the Orthodox Islamic dietary laws that he follows.  Plaintiff claims that the failure to do so is a violation of the free exercise clause of the First Amendment and Article I, Section 3 of the Florida Constitution.[3]

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that prisoners retain First Amendment rights, but "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Id.* at 348 (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)).  To ensure that prison officials are afforded appropriate deference by the courts, the Court has established a "reasonableness" test that is less restrictive than the test normally applied to alleged infringements of fundamental constitutional rights.  The Court further explained:

> "'[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  This approach ensures the ability of corrections officials "to anticipate security problems and to adopt

---

[3] Plaintiff concedes in his response that summary judgment should be entered as to the First Amendment claims against Kim Southerland, Timothy Cannon, Michael Dew, and Jodi Bailey.  (ECF No. 185 at 2.)

innovative solutions to the intractable problems of prison administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree."

*Id.* at 349-50 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987) and

*Procunier v. Martinez,* 416 U.S. 396, 405 (1974)) (citations and footnotes

omitted).

The RLUIPA "affords confined persons greater protection of religious

exercise than what the Constitution itself affords."  *Smith,* 502 F.3d at

12566 (citations and quotation marks omitted).  The compelling state

interest test is less favorable to defendants than the reasonableness test.

Accordingly, because Defendants have prevailed on the RLUIPA claim, it

follows that they are entitled to summary judgment on Plaintiff's First

Amendment claim.[4]  Defendants have demonstrated that their failure to

provide Plaintiff an individualized diet is reasonably related to legitimate

penological interests and that providing Plaintiff with satisfactory

---

[4] Plaintiff also purports to bring a claim against Defendants under the free exercise clause of the Florida Constitution, Article I Section 3.  Summary judgment should be granted in favor of Defendants as to this claim.  When determining whether prison regulations that interfere with the free exercise of religion violate the free exercise clause of the Florida Constitution, Florida courts adhere to the *Turner v. Safley* test of reasonableness.  *See, e.g.*, *Yasir v. Singeltary*, 766 So.2d 1197 (Fla. Dist. Ct. App. 2000); *Toca v. State*, 834 So.2d 204 (Fla. Dist. Ct. App. 2002).  Thus, the analysis is identical to Plaintiff's federal claim.

alternatives—including the current CFO option—is the least restrictive means of addressing this compelling state interest.

Furthermore, the Defendants[5] sued in their individual capacity have demonstrated that none of them had the authority to provide, approve or authorize a special religious diet.  (ECF Nos. 165-1-165-13.)  Without the ability to provide a specific diet, Defendants lack the causal connection to the denial of a specific diet that forms the basis of Plaintiff's First Amendment claim.  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)(To establish liability in a § 1983 action, the claimant must show that the official "personally participate[d]" in the act or there was "causal connection between the actions of [the] supervising official and the alleged constitutional deprivation.").    Summary judgment, therefore, should be granted to Defendants on Plaintiff's First Amendment claim.

## C.  Fourteenth Amendment claim

Plaintiff also contends that the failure of Defendants Crews, Cannon, Dew, Upchurch, Taylor, Southerland, Tallent, Bailey, Creamer, Andrews, Fuhrman, Campbell, and Henkle to provide him with a diet that does not

---

[5]Defendant Michael Crews, as the former Secretary of the Florida Department of Corrections, is the only Defendant sued in an individual capacity who did have authority over the provision of religious diets.  However, despite his connection to the claim, he is still entitled to summary judgment based on the reasonableness test as discussed above.

violate Orthodox Islamic dietary laws is a violation of the equal protection clause of the Fourteenth Amendment and is the result of intentional discrimination based on his religion.

To state a claim for a violation of equal protection, a prisoner must show that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Muhammad*, 388 F. App'x at 899 (citing *Sweet v. Sec'y Dep't of Corr.*, 467 F.3d 1311, 18-19 (11th Cir. 2006)). Plaintiff's claim for a violation of equal protection fails because he has not produced any evidence of discrimination in this case.  Defendants' evidence demonstrates that the decision to provide a kosher diet rather than a halal diet was based on the Department's view that the kosher diet satisfies the religious needs of various religious groups, including Muslims. And while Defendants have denied any intentional discrimination against Plaintiff in their sworn declarations (ECF Nos. 165-1-165-15) Plaintiff admits that he does not have any direct evidence of discrimination. Plaintiff testified at this deposition:

"Q: But–so, do you have any evidence at this point that their decisions to do this are based on intentional discrimination against Muslims?

A: I mean, you can never prove somebody's mind-frame with direct evidence, ma'am.  All you can do is go on circumstantial evidence, unless the person actually tells you, yeah, I don't like Muslims and discriminate against them.  So I'm just basing this all on circumstantial evidence, ma'am."

(ECF No. 165-14 at 34-35.)

In addition to the fact that Plaintiff's has not submitted any evidence that Defendants discriminated against him Defendants (with the exception of Defendant Crews) did not have the authority either to approve or provide Plaintiff with a specific religious diet. In the absence of authority to approve the diet, there is no causal connection to establish liability under § 1983. *Cottone*, 326 F.3d at 1360.  Defendants are, therefore, entitled to summary judgment in their favor on Plaintiff's equal protection claim.

Plaintiff also contends that Defendants' actions violated the equal protection clause of the Florida Constitution. To demonstrate a violation of equal protection, the claimant must show that he was similarly situated to other persons and was treated differently, and those differences in treatment do not bear a rational relationship to a legitimate state purpose. *See Duncan v. Moore*, 754 So.2d 708 (Fla. 2000).  The Department's

decision to provide the CFO option is rationally related to the state purpose of reducing costs spent on religious diets.  As explained by Defendants, the reason for choosing a kosher diet (rather than a halal diet) is because a kosher diet satisfied many of the dietary requirements of other religions. Defendants' explanation meets the rational basis test and, accordingly, summary judgment should also be granted as to this claim.

### D.  Plaintiff's Motion for Partial Summary Judgment

Lastly, in Plaintiff cross motion for partial summary judgment , ECF No. 139, he contends that he is entitled to summary judgment on the issue of whether the failure to provide him with meals that meet his religious dietary requirements is a substantial burden to his practice of religion. While there is no dispute in this case that the failure to provide Plaintiff with meals that satisfy his religioius dietary requirements creates a substantial burden on his practice of religion that does not entitle Plaintiff to relief on his RLUIPA or First Amendment claims.

As discussed above, under RLUIPA, establishing a substantial burden on religious exercise is only the first part of the analysis.  Once a plaintiff shows a substantial burden, the defendant must show that the policy in question is the least restrictive means of furthering a compelling

governmental interest.  In this case, Defendants have met their burden of showing that denial of an individualized religious diet to Plaintiff and instead providing Plaintiff with the CFO is the least restrictive means of furthering their compelling interest in cost containment, lessening administrative burdens, and decreasing security risks.  The Department has provided sufficient uncontroverted evidence demonstrating that the costs, administrative hurdles, and increased security problems associated with fulfilling Plaintiff's request for an individualized diet would be unmanageable.  Plaintiff, therefore, is not entitled to summary judgment on his RLUIPA claim simply by showing that the diets provided to him by the Department substantially burdened the practice of his religious beliefs.

Nor is Plaintiff entitled to summary judgment on his First Amendment claim.  As previously discussed, the RLUIPA "compelling state interest" test is less favorable to Defendants than the "reasonableness" test of the First Amendment.  Therefore, because Plaintiff is not entitled to summary judgment on his RLUIPA claim, he is not entitled to summary judgment on his First Amendment claim.  Accordingly, Plaintiff's motion for partial summary judgment, ECF No. 139, is due to be denied.

## VI. RECOMMENDATION

In light of the foregoing, it is therefore respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment (ECF No. 165) should be **GRANTED**, Plaintiff's Motion for Partial Summary Judgment (ECF No. 139) should be **DENIED** and the Clerk should be directed to enter final judgment in favor of Defendants.

**IN CHAMBERS**  this 10th day of March 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**