# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

AKEEM MUHAMMAD,

        *Plaintiff,*

v.                                 **CASE NO. 4:14CV379-MW/GRJ**

MICHAEL CREWS ET AL.,

        *Defendants.*

_____/

## ORDER ON REPORT AND RECOMMENDATION

Plaintiff Akeem Muhammad[1] claims that various officials

with the Florida Department of Corrections ("DOC")—and, effec-

tively, the DOC itself—have in the past failed to provide him with

"a diet, any diet, that does not violate . . . Orthodox Islamic dietary

---

[1] The Magistrate Judge's Report and Recommendation, ECF No. 204, indicates that Muhammad is a "frequent filer" and that he "initiated the instant suit in state court" in order to "avoid the bar on filing" in federal court. Muhammad objects to this characterization and notes, among other things, that he has "paid in full the $605 filing and service fees" in state court. ECF No. 207, at 2. To be abundantly clear: whether Muhammad's is a "frequent filer" is irrelevant to this case. This Court does note, however, that whatever Muhammad's status, he has had a fair amount of success in court, and even some of his losing arguments have later turned out to be winners. *See Muhammad v. Sapp*, 494 F. App'x 953, 956 (11th Cir. 2012) (affirming dismissal of Muhammad's claim that DOC "regulation requiring inmates . . . to be clean shaven, absent a medical waiver" violated RLUIPA because regulation "satisfied the compelling government interest and least restrictive means test"), *called into doubt by Holt v. Hobbs*, 135 S. Ct. 853 (2015) (holding that "Arkansas Department of Correction's grooming policy, which prohibit[ed] inmates from growing beards unless they have a particular dermatological condition," violated RLUIPA).

laws." ECF No. 64, at 3. Specifically, he claims that "[f]rom 2003 to April 2014, [he] repeatedly requested institutional and [DOC] officials . . . to provide or approve, authorize or direct institutional officials to provide him a diet that does not violate the Orthodox Islamic dietary laws." *Id.* at 17. These requests were, he claims, denied. *Id.*

Muhammad originally brought suit in state court in January of 2014, *see* ECF No. 3, at 1, shortly after which DOC apparently made some changes to its certified food option ("CFO") diet to render that option compatible with Muhammad's beliefs, ECF No. 64, at 23–24. Muhammad then requested to be served the revised CFO diet but was refused; finally, in May of 2014, he was given the new CFO diet. *Id.* at 24. It appears that Muhammad is still being provided with this diet. ECF No. 207, at 8.

In his second amended complaint, Muhammad brings claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Florida Religious Freedom Restoration Act ("FRFRA"), the Free Exercise Clause, the Equal Protection Clause, and two provisions in the Florida Constitution. ECF No. 64, at 26. He also seeks various forms of relief: (1) a declaratory judgment that Defendants' past failure to provide him with a diet that fits

his religious beliefs violated the above-mentioned laws; (2) a permanent injunction requiring Defendants to provide him with a diet that fits his religious beliefs, provided certain future conditions are met; (3) nominal and punitive damages against Defendants in their individual capacities under 42 U.S.C. §1983; and (4) costs. *Id.* at 26–27.

Since the time of the second amended complaint, much has happened in this case. The official-capacity claims against all defendants other than the Secretary of the DOC have been dismissed. ECF No. 144. The remaining defendants have filed a motion for summary judgment, ECF No. 165, and Muhammad himself has filed a motion for partial summary judgment, ECF No. 139. The Magistrate Judge issued a Report and Recommendation on these motions on March 10. ECF No. 204. The Magistrate recommends that Defendants' motion be granted and Muhammad's motion be denied. *Id.* at 41.

Muhammad makes a number of objections to the R&R, many of which overlap with one another and/or are without merit. The objections that need to be addressed can be summarized as follows:

(1) Objections 3, 4, 8, 14, 32, & 33: Muhammad argues that the Magistrate misunderstood the nature of his RLUIPA and

FRFRA claims and therefore made a number of errors in analysis.

(2) Objections 5, 6, 7, 9, 11–13, 16–31: Muhammad argues that the Magistrate made a number of errors in legal analysis in ruling on the RLUIPA and FRFRA claims.

(3) Objection 10: Muhammad argues that the Magistrate failed to address his claim for declaratory relief.

This Court has considered the R&R and Muhammad's objections. The Magistrate Judge's reasoning with respect to the Equal Protection claims is sound, and this Court will adopt the portions of the R&R dealing with those claims as its opinion over Muhammad's objections. *See* ECF No. 204, at 36–39. However, having considered Muhammad's objections to the R&R's treatment of his RLUIPA, FRFRA, and Free Exercise claims, this Court believes these claims should be re-analyzed. It appears that the nature of Muhammad's claims was slightly misconstrued. Because re-analysis will involve the consideration of certain evidence that was not considered by the Magistrate in preparing the R&R, it is appropriate to remand this case to the Magistrate to conduct this analysis in the first instance. So, the R&R is rejected in part, as explained in more detail below.

4

The R&R does not address some jurisdictional and mootness issues that, while not raised by the parties, should be addressed first.

## I.   JURISDICTIONAL ISSUES

### A. Standing

"The doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction. . . . He bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citations and quotations omitted). "[S]tanding is determined at the time the action is brought, . . . and we generally look to when the complaint was first filed, not to subsequent events." *Mink v. Suthers*, 482 F.3d 1244, 1253–54 (10th Cir. 2007) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). When a plaintiff files an amended complaint, the allegations of that complaint can support standing, but the existence (or lack) of standing is still measured from the time of the initial complaint. *See S. Utah*

*Wilderness All. v. Palma*, 707 F.3d 1143, 1152–53 (10th Cir. 2013).[2]

At the time Muhammad filed his initial complaint in early 2014, he possessed standing for his claims for declaratory and injunctive relief. Therefore, the fact that DOC had changed course by the time Muhammad filed his second amended complaint does not defeat standing for his claims for injunctive and declaratory relief. Muhammad clearly has standing to bring claims for damages.

## B. Mootness

The harder question is whether DOC's change of course—its provision of the CFO diet to Muhammad starting in May of 2014—mooted Muhammad's claims for injunctive and declaratory relief. "Generally, the party asserting mootness bears the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again. . . . [H]owever, . . . government actors enjoy a rebuttable presumption that the objectionable be-

---

[2] If a plaintiff brings an entirely new claim for relief in an amended complaint, or a claim for a different kind of relief, or names new defendants, then perhaps the date of the amended complaint is the relevant date for standing purposes for those claims and defendants. *See, e.g.*, *Eternal Word Television Network, Inc. v. Sebelius*, 935 F. Supp. 2d 1196, 1214 n.16 (S.D. Ala. 2013). But such is not the case here, at least not for the claims and defendants that matter.

havior will *not* recur." *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) (internal citations, quotations, and alterations omitted). Here, there is (somewhat surprisingly) no "party asserting mootness," but this Court nonetheless can and, under the circumstances, must address the issue of mootness because mootness goes to justiciability. *See id.* at 1308–09.

This Court concludes that Muhammad would be able to overcome the presumption that DOC is going to continue serving him food that complies with his religious dietary requirements. Defendants themselves make the best argument in support of this conclusion. Defendants note that "[w]hile [DOC] is currently providing the CFO to inmates statewide, [DOC] believes it should not be compelled to do so under RLUIPA." ECF No. 165, at 37–38. Defendants then go on to detail the costs associated with the CFO program, and include the following paragraph in their argument:

> Muhammad may also suggest to the Court that because Florida voluntarily wants to provide the CFO, it has no basis to assert a compelling interest why RLUIPA cannot be invoked to compel it to provide him the meals he seeks. [FN 9: The Florida Department of Corrections has made a policy decision to provide an accommodation for those inmates whose religious beliefs require them to keep kosher, but the Department

> firmly believes that whether that policy decision
> should be implemented, and how and when it should
> be implemented, is not compelled by RLUIPA given
> the substantial costs associated with providing this
> type of religious diet.] . . . Merely because a state
> chooses to absorb a risk or a cost does not mean that
> either has evaporated; they are still there. This is es-
> pecially true of costs. Bills must be paid, and money
> must be found to pay them, which sometimes means
> forgoing other costs. . . . For a prison system, [this]
> might mean forgoing roofs for prisons and salaries for
> security staff. But these are policy choices left to the
> states under RLUIPA, not compelled by it.

*Id.* at 42.[3] This Court could offer more examples, but hopefully the point is clear—*by its own admission*, DOC is offering Muhammad and those like him the CFO diet out of a tenuous beneficence, subject to cancelation at the first sign of budgetary trouble. Muhammad's claims for injunctive and declaratory relief are thus not moot.

## II.    THE NATURE OF MUHAMMED'S RLUIPA CLAIM

In his second amended complaint and again in his opposition to summary judgment, Muhammad made clear the nature of his

---

[3] Defendants' statement that DOC might have to forgo "roofs for prisons" if its budget were to be cut seems astounding. But of course it contains a kernel of truth. *See* Mary Ellen Klas, *Chronic Prison Woes Remain Unresolved at Start of Legislature Session*, Tampa Bay Times (Feb. 28, 2015), http://www.tampabay.com/news/politics/stateroundup/chronic -prison-woes-reveal-florida-legislatures-priorities/2219526.

request for injunctive relief. He seeks "[a] permanent injunction requiring Defendants, their successors, and their agents to provide [him] a diet, any diet, that does not violate the Orthodox Islamic dietary laws" provided that certain conditions exist in the future. ECF No. 64, at 26–27; ECF No. 185, at 13. He also asks for a declaratory judgment that Defendants *in the past* violated RLUIPA and other laws by failing to provide him with a diet that didn't violate his beliefs. ECF No. 64, at 26.

In their summary judgment motion, Defendants recast this as a request for an "individualized diet." They did this as follows:

> At the outset, Defendants note that Muhammad is currently receiving the CFO diet, which he has admitted satisfies the Orthodox Islamic dietary laws outlined in his complaint. . . . However, Muhammad has requested a permanent injunction requiring the Department to provide him with any diet (not limited to the CFO) that does not violate his stated religious dietary requirements. . . . Thus, should the Department change the CFO menu where Muhammad became dissatisfied with it (for example, adding in kosher meat), or eliminate the program all together, Muhammad's request in this case amounts to one seeking an individualized religious diet for a sole inmate. Muhammad essentially wants to strip the Department of the freedom to make decisions regarding what diets to offer inmates and to require a special diet just for him.

ECF No. 165, at 37. This characterization of Muhammad's request

ignores the fact that Muhammad only seeks an injunction *under certain future conditions*—namely, "only if or to the extent that (i) [he] has a sincere religious belief that requires him to consume such a diet; (ii) [he] has not abused such a diet within the preceding two years; and (iii) the provision of such a diet to [him] does not cost more than Defendants' then existing medical diets, vegan diet, and/or regular diet." ECF No. 64, at 27.

The R&R analyzes Muhammad's claims for prospective relief under the framework urged by Defendants. *See* ECF No. 204, at 17. That is, the R&R answers the question of whether *not* providing Muhammad with an appropriate diet would constitute the least restrictive means of serving a compelling state interest by inquiring into the costs of an "individualized diet." *See id.* at 25–29. This is the wrong way of answering this question. Clearly the CFO diet *itself* might constitute a less restrictive means of meeting a compelling state interest. In other words, if DOC were not currently offering Muhammad an Orthodox Islam-compliant diet, the CFO program would be one thing to consider when determining whether there were less restrictive alternatives available to the state.

No doubt part of the misunderstanding is attributable to the

fact that, because of Defendants' decision to provide Muhammad with the CFO diet, Muhammad is now seeking an odd sort of injunction—a conditional prohibition on future conduct, dependent for its operation on a host of unknowables. This is a different kind of injunction from, say, one requiring state officials to recognize same-sex marriages. As Justice Cardozo once explained, "[t]he distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932). Muhammad's requested injunction would seem to almost operate as a mini-RLUIPA, requiring future calculations of costs and the like. The propriety of such an injunction is hard to assess, and it's perhaps not surprising that Muhammad's request for relief was misconstrued by Defendants .

As for Muhammad's request for declaratory relief, this was not addressed in the R&R. Again, the question is *not* whether denying Muhammad an "individualized diet" is the least restrictive means of achieving a compelling state interest; rather, the

11

question is whether, during the relevant time period, DOC's refusal to provide Muhammad with *any* diet that met his religious needs was the least restrictive means of achieving a compelling state interest. The existence of the CFO diet—and its current implementation—are of course relevant to that analysis.

In short, Muhammad's objections to the treatment of his RLUIPA claim in the R&R are well taken. These claims should not have been analyzed as cast by Defendants, but rather as articulated by Muhammed in his objections. Before addressing what steps should be taken next, however, it's necessary to discuss a few issues related to the remedies available to Muhammad.

## III.   REMEDIES FOR RLUIPA/FRFRA VIOLATIONS

As discussed above, Muhammad's claims under RLUIPA and FRFRA need to be re-analyzed. But there's a potential problem—even though Muhammad's claim for injunctive relief isn't moot, is it nonetheless barred by sovereign immunity and/or the Eleventh Amendment? And what about his claim for declaratory relief? In answering these questions, this Court will assume for the moment that DOC's refusal from 2010 to 2014 to provide Muhammad with a diet that did not force him to break the Orthodox Islamic dietary laws violated RLUIPA.

## A. Declaratory Relief

The Supreme Court held in *Sossamon v. Texas*, 563 U.S. 277 (2011), that RLUIPA does not allow for damages awards against states. 563 U.S. at 293. However, the Court was careful to hold that "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits *for money damages* under RLUIPA," *id.* (emphasis added), a holding that is perhaps best characterized as an "implicit acceptance of suits for injunctive and declaratory relief" against states for violations of RLUIPA, *id.* at 298 (Sotomayor, J., dissenting).

So there is a good argument that Florida has waived its immunity to suit for declaratory relief under RLUIPA even when that declaratory relief pertains to wholly past violations of the statute. Even if this is not true, though, the circumstances of this case are such that the award of declaratory relief for past violations of federal law would be appropriate. In general, the Eleventh Amendment (and sovereign immunity in general) notwithstanding, a request for a declaration that a state's past actions violated some federal statute or the Constitution can, under appropriate circumstances, be entertained by a federal court. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) (noting that a

13

declaratory judgment would "not impose *upon the State* 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials,'" and that "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction.") (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)). One such appropriate circumstance is a case like *Verizon Maryland* in which "the prayer for declaratory relief adds nothing to the prayer for injunction." Such will often be the case where the violation of federal law is both in the past *and* ongoing.

Contrast this with a case in which the government has unambiguously changed course and stopped violating the law—that is, a case in which prospective injunctive relief is unavailable because there's no ongoing violation to enjoin. In such a case, a declaratory judgment to the effect that the state had in the past violated the law might have no utility save that it could "be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed. But the issuance of a declaratory judgment in these circumstances would have

much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment. . . . [A] declaratory judgment is not available when the result would be a partial 'end run' around" the Eleventh Amendment and sovereign immunity principles. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

In between these two extremes—declaratory judgment as mere tack-on to injunctive relief and declaratory judgment as damages in disguise—lies this case. This is not a case in which "the award of a declaratory judgment . . . would be useful . . . *only* if it might be offered in state-court proceedings as res judicata on the issue of liability," *see Mansour*, 474 U.S. at 73 (emphasis added), in large part because, unlike *Mansour*, there is a real threat of the defendants going back to violating federal law.[4] In other words, to the extent Muhammad seeks to prevent a future violation of federal law—namely, DOC returning to its pre-2014 practice of not providing him with a diet that allows him to eat without violating his religious beliefs—the award of declaratory relief to the effect

---

[4] In *Mansour*, the state defendants didn't change course at all—Congress altered federal law, rendering the state's actions lawful. *See Mansour*, 474 U.S. at 65.

that that past practice violated RLUIPA would have some of the same utility as an injunction, something which Muhammad recognizes. ECF No. 207, at 15–16. On the other hand, it's not clear that the type of prospective injunctive relief available in *Verizon Maryland* is even available here, because it is not clear whether there is an ongoing or an imminent/threatened violation of federal law within the meaning of the *Ex parte Young* doctrine.[5] The award of declaratory relief when no prospective injunctive relief is awarded would obviously "add something," unlike in *Verizon Maryland*.

But unlike in *Mansour*, such declaratory relief would not

---

[5] Whether a defendant's actions can be likely enough to recur to render a claim for injunctive relief non-moot but still not "impending enough" to make the alleged violation of federal law "ongoing" or "threatened" within the meaning of the *Ex parte Young* doctrine is an open question. The Eleventh Circuit and the Fifth Circuit have suggested, but not held, that a threat of future enforcement or recurrence sufficient to render a claim non-moot should also satisfy the *Ex parte Young* requirement of an ongoing or threatened violation. *See Nat'l Ass'n of Bds. of Pharm*, 633 F.3d at 1308 (treating argument about whether violation was ongoing for *Ex parte Young* purposes as argument about mootness); *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013) (rejecting argument that non-moot claim did not involve ongoing violation because "[that] theory, if accepted, would work an end-run around the voluntary-cessation exception to mootness where a state actor is involved"). The Sixth Circuit has suggested something similar. *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy . . . *Ex parte Young*."). The Seventh Circuit, on the other hand, has squarely held that a claim for relief can be non-moot but still not involve an ongoing violation. *See Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986).

There's no need for this Court to resolve this issue. For the reasons discussed in this Order, a declaratory judgment to the effect that DOC violated RLUIPA in the past would be consistent with sovereign immunity and Eleventh Amendment immunity.

"add something" that looks like damages. In fact, such relief wouldn't be an award of damages in disguise *at all*—at least not damages for a violation of RLUIPA—because RLUIPA does not allow for the recovery of money damages against a state *even in state court* without the state's consent. *See Alden v. Maine*, 527 U.S. 706, 712–13 (1999) (holding that "the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts"); *Sossamon*, 563 U.S. at 293 (holding that "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA"). There is no indication that Florida has waived its sovereign immunity to suit in state court for damages for RLUIPA violations, so Muhammad could not use a declaratory judgment "as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed." *Mansour*, 474 U.S. at 73.

FRFRA also does not constitute a waiver of sovereign immunity for suits seeking damages in state (or any other) court. The language specifying what remedies are available under FRFRA— "appropriate relief," *see* §761.03(2), Fla. Stat. (2015)—mirrors the

language of RLUIPA and, more importantly, the Religious Free-dom Restoration Act ("RFRA"). In fact, FRFRA was passed by the Florida Legislature after the Supreme Court held that RFRA did not apply against the states, and it was intended to ensure that RFRA-like protections would be in place for actions taken by state governmental entities. *See Warner v. City of Boca Raton*, 887 So. 2d 1023, 1031–33 (Fla. 2004). RFRA, in turn, has consistently been interpreted not to allow suits for damages against the sovereign. *See Davila v. Gladden*, 777 F.3d 1198, 1209–10 (11th Cir. 2015). True, many of these interpretations post-date the passage of FRFRA, but even in 1998 (the year FRFRA was passed) it was true that "Congress enacted RFRA to return to a pre-[*Employment Division, Department of Human Resources v.*] *Smith*[, 494 U.S. 872 (1990)] world, a world in which damages were unavailable against the government." *Webman v. Bureau of Prisons*, 441 F.3d 1022, 1028 (D.C. Cir. 2006) (Tatel, J., concurring). The Florida Legisla-ture presumably knew this, and in light of that knowledge, its bor-rowing of the language of RFRA should not be read as a waiver of Florida's immunity from suits for damages in FRFRA cases.

In short, then, the concerns animating the Supreme Court's decision in *Mansour* are not present here. Muhammad cannot take

a declaratory judgment that Defendants (really, DOC) violated RLUIPA in the past and use it in state court to extract damages from the state. Furthermore, unlike in *Mansour*, there is a real threat of the state returning to violating federal law, so a declaratory judgment would have an effect similar to an injunction. Even though such a declaratory judgment might *technically* "adjudicate the legality of past conduct"—something normally forbidden in an *Ex parte Young*-type action, *see Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999)—it would not directly or indirectly "impose *upon the State* a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials," *Verizon Maryland*, 535 U.S. at 646 (quotation omitted). It is necessary to "look to the substance rather than to the form of the relief sought" in determining whether a claim falls under the *Ex parte Young* exception to sovereign immunity. *Papasan v. Allain*, 478 U.S. 265, 279 (1986). A declaratory judgment that DOC violated RLUIPA in the past is, under the circumstances of this case, in *substance* a form of prospective relief.

"[T]he 'difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night.'" *Idaho*

*v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) (quoting *Edelman v. Jordan*, 415 U.S. 651, 667 (1974)). That is certainly true here. After a careful examination, however, it appears that a declaratory judgment that DOC violated RLUIPA in the past would be an appropriate form of relief under the *Ex parte Young* exception to sovereign and Eleventh Amendment immunity. Therefore, even assuming that Florida did not waive its sovereign and Eleventh Amendment immunity to suit for declaratory relief for past violations of RLUIPA, such relief would be appropriate in this case.[6]

### B. Prospective Injunctive Relief

It might be easier to simply conclude that as it *currently* stands, the provision of the CFO diet to Muhammad is a less restrictive alternative to not offering Muhammad any Orthodox Islam-compliant diet, and that therefore Secretary Jones in her official capacity should be enjoined from discontinuing the CFO diet.

---

[6] One question remains: if a declaratory judgment were entered to the effect of "it is declared that X violated RLUIPA by failing to provide Muhammad with a diet . . .," who would "X" be? The judgment would only have practical effect going forward against Secretary Jones in her official capacity, but she was not the Secretary of DOC during the relevant time period. It seems odd to name past DOC Secretaries in their official capacities, given that they no longer serve in those capacities. The correct course would probably be to declare that Secretary Jones's predecessors violated RLUIPA. In any event, this issue need not be resolved at this time.

There are two reasons why this would be inappropriate. First, as discussed above, it is not clear that the threatened cessation of the CFO diet is imminent enough to support such relief. Second, such an injunction would clearly tie the hands of DOC more than a declaratory judgment concerning its past behavior, and would thus potentially run afoul of the requirements of the Prison Litigation Reform Act ("PLRA"). *See* 18 U.S.C. §3626[7]; *see also United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1227 (11th Cir. 2015) (PLRA requirements for prospective relief apply to RLUIPA suits).

Given these concerns, this Court will not in any event award prospective injunctive relief to Muhammad. If Muhammad's RLUIPA rights were infringed *in the past*, a declaratory judgment to that effect would, as discussed above, both comport with sovereign immunity and constitute a less intrusive means of protecting Muhammad's rights than a permanent injunction.

---

[7] "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. §3626(a)(1)(A). Because "the term 'prospective relief' means all relief other than compensatory monetary damages," *id.* §3626(g)(7), both the injunction and declaratory relief sought by Muhammad fall within the ambit of the PLRA.

## IV.   REMAINING ISSUES

### A. Free Exercise Clause Claims

For the same reasons discussed above vis-à-vis Muhammad's RLUIPA and FRFRA claims, the portion of the R&R dealing with Muhammad's Free Exercise claims, *see* ECF No. 204, at 33–36, must be rejected in part. However, only Defendant Michael Crews had authority over the provision of religious diets, and so only he can be held liable under §1983 for any violation of the Free Exercise Clause. Accordingly, summary judgment will be granted to the remaining defendants in their individual capacities on the Free Exercise claims.

### B. Evidentiary Rulings

A number of Muhammad's objections relate to the Magistrate's rulings on the use of depositions taken of Defendants (and other DOC officials) in a different case involving similar (though not identical) issues. The Magistrate ruled that "[a]lthough [DOC] officials are Defendants in both cases, the plaintiff and subject matter are different in both actions and, therefore, depositions taken in [the other case] are inadmissible." ECF No. 204, at 31. The Magistrate also ruled that expert reports prepared for the other case are not admissible. *Id.* at 31–32. As an alternative basis

for excluding such evidence at the summary judgment stage, the Magistrate ruled that "the depositions and expert reports are not relevant to the primary issue in this case" because the other case "concerned the provision of kosher diets to all Jewish inmates in [DOC] with a sincere religious belief, while this case concerns provision of an individualized religious diet to an Orthodox Muslim." *Id.* at 32.

As to the relevance rationale, the Magistrate's reasoning must be rejected because of the focus on an "individualized religious diet." As explained above, this is not the proper way of viewing Muhammad's claim. Muhammad's claim is not that the failure to provide him with an "individualized diet" violated or would violate RLUIPA; rather, it is that the failure to provide him with *any* diet that conformed with his religious beliefs violated RLUIPA. An individualized diet may have been one way for DOC to avoid imposing a substantial burden on Muhammad's practice of his religion, but apparently there were other ways, including an across-the-board tweak to the CFO diet. When Muhammad's claim is viewed in the proper light, it is clear that the depositions and expert reports from the other case are certainly *relevant*—the differences between the other case and this case go to the weight of the

evidence, not its admissibility.

The Magistrate's other rationale must also be rejected as it pertains to the depositions. Rule 56 of the Federal Rules of Civil Procedure provides that a party can support factual positions at the summary judgment stage by "citing to particular parts of materials in the record, including depositions, documents, . . . or other materials," and that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c). There's an argument to be made that a proper deposition—that is, one that was taken in conformance with the applicable rules—from some other proceeding should simply be treated as any other deposition for purposes of summary judgment, and that the only proper objections to the consideration of its contents would be based on the Federal Rules of Evidence. But assuming that's not true, and that a deposition from a different case has to *itself* be admissible *at trial* to be considered for purposes of summary judgment—that is, the deposition, and not the testimony therein, must be admissible at trial—much of what Muhammad seeks to introduce would still be admissible.

Rule 32 governs the use of depositions "at a hearing or trial."

It provides in relevant part that

> [a]t a hearing or trial, all or part of a deposition may be used against a party on these conditions:
>
> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
>
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>
> (C) the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1). Subsections (2) through (8) go on to lay out a number of conditions under which depositions can be used at trial. Relevant to this case is subsection (3), which provides that "[a]n adverse party may use for any purpose the deposition of a party." This means that Muhammad could use Defendants' depositions from other cases at trial in this case, provided those depositions also meet the requirements of Rule 32(a)(1)(A) & (B). *Cf. Ueland v. United States*, 291 F.3d 993, 995–96 (7th Cir. 2002) (holding that judge should have admitted at trial a "deposition[] taken by the United States in a separate lawsuit" because the deponent was incarcerated more than 100 miles from the place of trial and thus fit into the exception for use of depositions now found in Rule 32(a)(4)(B)). And because he could use them at trial,

they should be considered at summary judgment to the extent they're relevant and conform with Rule 32(a)(A) & (B).

The expert reports should also be considered for purposes of summary judgment. The reports authored by Defendants or those acting at their behest are admissible under the "party-opponent" hearsay exclusion. *See, e.g.*, *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006).[8]

The two remaining expert reports—those authored by Clark and Watkins in the other case—are clearly not admissible as statements by a party-opponent. This Court finds, however, that they are admissible under the "residual" or "catch-all" hearsay exception. This exception can be used to admit a statement that would otherwise be excludable if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." Fed.

---

[8] Of course, it may be the case that certain statements *in* those reports are inadmissible because they are hearsay not within any exception.

R. Evid. 807(a).[9]

All four of these conditions are met with respect to the Clark and Watkins reports. These are sworn expert reports prepared for the United States Department of Justice in a lawsuit with issues similar to this one, and so clearly meet the first two prongs. Mu-

---

[9] Rule 807 also requires that notice be given before a statement is introduced "so that the [adverse] party has a fair opportunity to meet it." Fed. R. Evid. 807(b). This notice requirement doesn't bar the consideration of the Clark and Watkins reports for two reasons. First, the purpose of the notice requirement is to ensure that the party against whom evidence is offered "has an opportunity to counter it and protect himself against surprise," which is why all that is generally required is that that party "has notice of [the evidence's] existence and the proponent's intention to introduce it." *See United States v. Munoz*, 16 F.3d 1116, 1122 (11th Cir. 1994). Here, Defendants were and are obviously aware of the existence of the Clark and Watkins reports. As for Muhammad's intention to introduce them, that should have been clear to Defendants. In multiple filings, Muhammad noted the importance of the documents from the other case and detailed his efforts in trying to get those documents through discovery requests. *See* ECF No. 75, at 2–4; ECF No. 79, at 6–9, 15–21; ECF No. 104. And even aside from these filings, Defendants must have expected that Muhammad would try to use such evidence. *Cf. United States v. Leslie*, 542 U.S. 285, 291 (5th Cir. 1976) ("The record does not indicate whether the government complied with the notice requirement . . . . Even if it did not comply, appellant was not harmed, since his counsel had a fair opportunity to meet the statements. Defense counsel undoubtedly expected the prosecution to call one or more of those co-defendants . . . .").

The second reason is that the question of notice doesn't come into play at the summary judgment stage. Assuming for the moment that Defendants were not given proper notice of Muhammad's intention to introduce the Clark and Watkins reports in response to their motion for summary judgment, that failure does not preclude this Court from considering them at this stage. *See Amcast Indus. Corp. v. Detrex Corp.*, 779 F. Supp. 1519, 1527 (N.D. Ind. 1991), *aff'd in part, rev'd in part* 2 F.3d 746 (7th Cir. 1993) ("the record contains no suggestion that Detrex was given notice that the plaintiffs intended reliance on [the residual exception], . . . but at the summary judgment stage, the court will consider the statements' admissibility under the remaining tests").

hammad—a prisoner proceeding pro se—can hardly expect to procure similar expert reports about the economics and security issues surrounding the provision of alternative diets through "reasonable efforts" of his own. And allowing Defendants to offer their own de facto expert opinions[10] without allowing Muhammad a reasonable chance to rebut those opinions would not serve the interests of justice.

To be clear, this Court's ruling should not be construed as an endorsement of the regular use of the residual hearsay exception as a tool to bring expert reports from a similar case into one's own case. Under normal circumstances, the residual exception would not be appropriate because most parties can obtain their own expert reports—that is, they can, through "reasonable efforts," find evidence just as probative, and probably more probative, on the issues involved in their case than an expert report from another case. *See, e.g.*, *N5 Tech. LLC v. Capital One N.A.*, 56 F. Supp. 3d

---

[10] It's true that Defendants have not sought to introduce any expert reports in this case. However, some of the defendants' declarations submitted in support of summary judgment contain claims about the safety concerns of providing special diets, ECF No. 165-15, and the cost of providing special diets, ECF No. 165-7 & 170-1—the very issues addressed by the expert reports Muhammad seeks to introduce. Moreover, two of the defendants who submitted declarations prepared expert reports in the other case, and Muhammad seeks to introduce those reports, too, in this case.

755, 765 (E.D. Va. 2014) (rejecting attempt by plaintiff to introduce expert report through Rule 807 because "plaintiff, through reasonable efforts, could have retained its own expert and presented testimony on the doctrine of equivalents, but chose not to do so" and "[p]laintiff must now live with the consequences of this choice"). Nor should this Court's ruling be construed as a green light to any prisoner to introduce any expert report in any case through the residual exception. Many, if not most, prisoner cases don't involve issues requiring expert testimony. In those cases that do require such testimony, it is unlikely that there is an existing expert report that would have much probative value on the issues involved in the case. A report dealing with prison conditions in a different state, for instance, will have limited value because prisons operate in markedly different ways from state to state.

But here we have a somewhat unique situation: there exist recent expert reports prepared for a case with similar issues to this one, brought against (more or less) the same defendants, and a pro se prisoner wishes to use those reports to rebut certain claims made by Defendants. Under these circumstances, the Magistrate should have considered the expert reports of Clark and Watkins

under the residual hearsay exception.[11]

## V.    CONCLUSION

Muhammad's claims under RLUIPA, FRFRA, and the Free Exercise Clause[12] must be re-analyzed under the proper framework. For purposes of Muhammad's request for a declaratory judgment, the key question is this: did DOC (technically, the Secretary of DOC) violate RLUIPA and FRFRA by failing to provide Muhammad with a diet that allowed him to eat in conformance with his religious beliefs from May of 2010 until May of 2014?

**IT IS ORDERED:**

1. The Report & Recommendation, ECF No. 204, is **accepted in part** over Plaintiff's objections and **rejected in part**. In particular, the portion of the R&R dealing with Plaintiff's Equal Protection and related state-law claims, *id.* at 36–39, is accepted and adopted as this Court's opinion. Furthermore, the conclusion that all individual Defendants except Michael Crews are entitled to

---

[11] Again, there may be portions of the reports that are inadmissible because they contain hearsay not within an exception.

[12] And Muhammad's claims under the Florida equivalent of the Free Exercise Clause.

summary judgment on Plaintiff's Free Exercise and re-
lated state-law claims, *id.* at 36, is accepted and adopted
as this Court's opinion. However, the Magistrate Judge
must re-analyze Plaintiff's RLUIPA, FRFRA, and Free
Exercise claims as discussed in this Order.

2. All claims against Defendants in their individual capaci-
ties are dismissed with prejudice *except* the Free Exercise
and related state-law claims against Defendant Michael
Crews. This Court does *not* direct entry of judgment un-
der Federal Rule of Civil Procedure 54(b) for those claims
that have been dismissed.

3. For clarity's sake, these are the remaining claims in this
case:

    a. the individual-capacity claim against Defendant
       Crews for violating the Free Exercise Clause and
       Article I, Section 3 of the Florida Constitution; and

    b. the official-capacity claim for declaratory relief
       against Defendant Jones for violating RLUIPA and
       FRFRA.

4. This case is remanded to the Magistrate Judge for further

   proceedings consistent with this Order.

**SO ORDERED on June 15, 2016.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**